## WELD v. PETERS et al.

A judgment creditor cannot treat a sale of a slave, made *bonâ fide* by his debtor and accompanied by possession, as null, and seize the slave in the hands of the purchaser. He must institute a direct action to annul the contract. *Aliter,* where the act is a mere simulation.

Where an immovable is purchased by a commercial partnership, the partners become joint-owners, and none of them can alienate it without the consent of the rest. But where such property is sold by one of the partners, for a consideration which enured to the benefit of the partnership, and the other partner, though informed of the sale, makes no objection to it, he will be considered as having ratified it.

APPEAL from the Commercial Court of New Orleans, *Watts,* J. *G. B. Duncan,* for the apellant. *Lockett* and *Goold,* for the defendants.

The judgment of the court was pronounced by

KING, J. *Peters & Millard,* in the execution of a judgment which they had obtained against *Hunt & Howard,* caused to be seized a slave then in the possession of *Weld.* The proceeding was enjoined by the plaintiff, who claimed to be the owner of the slave seized. In the court below the slave was decreed to be the property of *Hunt & Howard,* subject to seizure in satisfaction of their debts, and from this judgment the plaintiff appealed. The issue between the parties is, the ownership of the slave. The plaintiff exhibits as his title a conveyance by public act from *Hunt & Howard,* passed more than six years previous to the seizure. The defendants allege that, the only consideration for which the sale was given was, that the plaintiff should become the surety of *Howard* on a bail bond, while the latter was under arrest at the suit of *Peters & Millard,* and that the object of the transfer was to secure him against the consequences of this suretyship; that the bond has long since been discharged, and the plaintiff relieved from all liability arising from it; that the consideration has thus failed; and that the slave, who had never really ceased to be the property of *Hunt & Howard,* is liable to seizure in satisfaction of their debts. They further aver that if the plaintiff was a creditor of *Hunt & Howard* at the date of the sale, the latter were then insolvent, and that the sale was intended to give an unjust preference to the plaintiff. They also contend that the slave belonged to the

commercial partnership of *Hunt & Howard*, and that the sale to *Weld* was from *Howard* alone, and conveyed his half only of the slave, and that, for the remaining half, the sale is null.

It appears from the evidence that, *Hunt & Howard* were commercial partners, the former of whom resided in Boston and the latter in New Orleans. *Howard* purchased the slave in question in the name of the partnership, by an act under private signature, and, on the 16th of May, 1839, indorsed on this act a transfer of him, also under private signature, to *Weld*. On the 14th June, 1839, *Peters & Millard* instituted a suit against *Hunt & Howard*, in which they caused *Howard* to be arrested. *Weld* became the surety on the bail bond given by *Howard*. Two of the witnesses, of whom the officer who made the arrest is one, state that *Weld* hesitated for some time whether he would become the surety of *Howard* on the bond, but finally consented to do so, on the condition that the slave should be conveyed to him. A notarial transfer of the slave, was made to *Weld* by *Howard*, acting in the name of his firm, on the 22d day of the same month, in which the price is stated to be $1800. The slave was at that time in the possession of the plaintiff, and has so continued ever since.

*Hunt & Howard* became embarrassed in their affairs, in May, 1839, and, on the 18th of that month, two days after the transfer under private signature, gave the management of their business to *Underhill*, one of the witnesses, who states that they were not then insolvent, but that their stock on hand and outstanding claims were sufficient to pay their debts. *Weld* was a creditor of *Hunt & Howard* at that time, for about $2000, on an open account, and his book-keeper states that this account was credited with the price of the slave. In addition to this, goods were turned over to the plaintiff about the date of the first sale, to an amount nearly sufficient, as was then supposed, to extinguish the indebtedness of *Hunt & Howard*, independently of the price of the slave. The account, however, was not then credited with their value. These goods were shipped off and sold, and produced $900. It is to be inferred from the acts of the parties that they intended that a credit should be given only for the nett proceeds of the merchandize delivered to the plaintiff, for we find that no credit was given at the time of delivery, and that, a year or two after these transactions, *Howard* set up a claim to the slave, on the ground that *Weld's* account had been extinguished by the price of the goods. *Weld* insisted that a balance remained due to him, the articles having produced less than their supposed value at the date of the delivery. *Howard* presented a bill to the plaintiff for payment, which the latter consented to pay on condition that *Hunt & Howard* should relinquish all claim to the slave, and that the plaintiff should abandon all further claim against them. Upon these terms final discharges were exchanged between the parties. The testimony of the witnesses can be reconciled on no other hypothesis than that the two transfers of the slave, the first under private signature and the second by public act, had two objects in view, the one to secure the claim of the plaintiff against *Hunt & Howard*, and the other to indemnify him against the consequences of his suretyship on the bail bond. The dates of the acts themselves, taken in connection with the testimony, support this view of the transaction. The first was passed a month before the arrest, at a time when *Hunt & Howard* were largely indebted to the plaintiff, and when the proceedings of *Peters & Millard* could have been foreseen. The second was passed after the arrest. Merchandize had been transferred in part payment of the plaintiff's claim, about the date of the private act, and previous to the arrest.

WELD
*v.*
PETERS.

The parties evidently considered that these goods and the price of the slave were more than adequate to extinguish the account of the plaintiff, and that a surplus would remain sufficient to indemnify the plaintiff against his liability on the bail bond. Later, when the goods were disposed of, the parties themselves considered that their proceeds, as well as the price of the slave, were necessary to balance their accounts, and exchanged receipts, each relinquishing all further claim against the other. The transaction appears from all the evidence to have been real, and not a simulation. It was based upon considerations which passed between the parties. Possession accompanied the transfer of the property, which had been open and uninterrupted for more than six years previous to the seizure made by the defendants. It has been repeatedly held that a judgment creditor cannot treat such a conveyance made by his debtor as null, and seize the property so conveyed to the hands of the purchaser. He must bring a direct action to annul the contract. 3 La. 479. 2 La. 214. When the act is a mere simulation, the party will not be driven to revocatory action; but such does not appear to have been the character of the act under consideration. *Cammack* v. *Watson, ante* p. 132. If the present suit is to be considered as being in the nature of a revocatory action, under the pleadings and evidence adduced, it has been prescribed by the lapse of the time within which such actions may be instituted.

The testimony of *Howard* was rejected by the court below, on the ground that, as a debtor of *Peters & Millard,* he was interested in rendering the slave liable for their judgment. His depositions however were taken in writing, to be used in this court if deemed admissible. We think it results from the declarations of the witness himself, that there is a balance of interest. If the cause be decided in favor of the defendants, it is true that the value of the slave will be applied to the payment of his debt to them; but, in that event, he will remain the debtor of the plaintiff, to whom he admitted himself to be indebted when acquittances were exchanged, some time after the sales. We think the judge erred in excluding this testimony, and we have treated it as before us, when considering the evidence in the cause.

It is urged that the slave belonged to the partnership of *Hunt & Howard,* and that *Howard* could only validly alienate his undivided half. It is true that when a commercial firm purchases immovables the partners become the joint owners of the property, and that it cannot be alienated by one of the members without the consent of his co-partners. It appears clearly from the evidence that *Hunt* subsequently approved and ratified the act. He was in the city some time after the sale, when he saw the slave in the possession of the plaintiff. His attention was specially called to the fact that the plaintiff had the slave in possession, and declared that he was owner of him. He evidently knew of the sale and of the considerations for which it had been made; and those considerations accrued to the benefit of the partnership. In the case of *Thomas* v. *Scott,* 3 Rob. 526, receiving a part of the price of real estate belonging to the partnership, which had been sold by one of the partners, was held to be a ratification of the sale.

It is therefore ordered that the judgment of the Commercial Court be reversed. It is further decreed that the plaintiff be the owner of the slave *Madison* named in his petition, that he be quieted in his ownership and possession of the same, and that the injunction issued in this cause be perpetuated. It is further ordered that the defendant pay the costs of both courts.